UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DOINA CARAGATA,

        Plaintiff,

-against-

MARK OPCO LP, MARK 2 RESTAURANT LLC d/b/a THE MARK/THE MARK RESTAURANT/THE MARK BAR, THOMAS NOCELLA, and JOSEPH HOLMES,

        Defendants.

Case No.:

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff Doina Caragata alleges as follows:

## INTRODUCTION

1. The Mark hotel is the self-proclaimed most "boldly lavish" hotel in New York, and its restaurant and bar the "most stylish meeting spot on Madison Avenue."

2. But The Mark missed the mark, when it retaliated against one of its older employees for complaining of sexual harassment and age discrimination.

3. Specifically, The Mark and the other Defendants discriminated and retaliated against Plaintiff by subjecting her to harassment and firing her almost instantaneously after she reported a younger male employee saying to her "fuck you, bitch," and later subjecting her to unwanted touching.

## JURISDICTION AND VENUE

4. This Court has original federal question jurisdiction under 28 U.S.C. § 1331 because this case is brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII") and the Age Discrimination in Employment Act ("ADEA"). This Court has supplemental jurisdiction over the New York law claims, as they are so related to the claims in

1

this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

5. Venue is proper in this District because Defendants conduct business in this District, and the acts and/or omissions giving rise to the claims herein alleged took place in this District.

**PARTIES**

6. Defendant Mark 2 Restaurant LLC d/b/a The Mark/Mark Restaurant/The Mark Bar. ("Mark 2") is a Delaware limited liability corporation authorized to do business in New York, with a headquarters and principal place of business located at 25 East 77th Street, New York, New York 10075. Mark 2 is engaged in the hospitality industry and owns and operates The Mark hotel, the Mark Restaurant by Jean-Georges, and The Mark Bar in Manhattan.

7. Defendant Mark Opco LP ("Mark Opco") is a Delaware limited partnership authorized to do business in the State of New York, with a headquarters and principal place of business located at 25 East 77th Street, New York, New York 10075. Mark Opco is engaged in the hospitality industry and owns and operates The Mark hotel, the Mark Restaurant by Jean-Georges, and The Mark Bar in Manhattan.

8. Mark 2 and Mark Opco, collectively referred to herein as "The Mark" or "Defendants."

9. Defendants Nocella and Holmes are upon information and belief residents of the State of New York.

10. The Mark has more than 15 employees and was Plaintiff's employer under Title VII, the New York State Human Rights Law, and the New York City Human Rights Law.

11. Plaintiff Doina Caragata ("Plaintiff" or "Caragata") worked for Defendants as a bartender from February 23, 2022 until her retaliatory termination on April 23, 2023. Plaintiff is a New York City resident and is 55 years old.

**FACTS**

12. Plaintiff began working for The Mark's luxury bar and restaurant in February of 2022.

13. Prior to joining The Mark, Plaintiff received The Big Apple Award for her work with her previous employer. This award is given to employees exceed all expectations in the realm of hospitality and bar and restaurant service. She also earned recognition as employee of the year and several awards for employee of the month.

14. After a long career in bartending and luxury hospitality, Caragata was a perfect fit for The Mark's bar and restaurant.

15. When Plaintiff began working for The Mark, she was one of 10 bartenders, three of which were women and seven were men. At 55 years old, Plaintiff was the oldest bartender by at least a decade. Most of Plaintiff's colleagues were in their 20s and 30s.

16. Because of Plaintiff's obvious age difference, many of her colleagues, barbacks and servers made fun of her and referred to her as, "Mama."

17. Plaintiff chose to ignore these comments and focused on providing The Mark's customers with top-notch service.

18. Plaintiff's colleagues and customers regularly acknowledged her hospitality skills. Her customers often returned to The Mark and specifically requested to be seated at the bar so they could enjoy her attentive service. Plaintiff's customers paid her compliments directly and also shared their positive experiences with Plaintiff's managers and posted their feedback online.

19. In or about April 2022, The Mark's Director of Food and Beverage left, and a new younger manager, Defendant Nocella took over the role.

20. Within a month, Defendant Nocella replaced all but one of the restaurant managers with new people.

21. In or about April 2022, Defendant Nocella also hired a new bartender, Melody, a woman in her 20s.

22. Plaintiff was instructed to train Melody for two nights.

23. During her training, Melody informed Plaintiff that she was the new "Head Bartender." Prior to Melody's employment, there was no Head Bartender role and no job posted to allow other bartenders to apply for the role.

24. Defendant Nocella simply awarded the position to the newest young female member of the team.

25. The Mark operates two bars – the main bar in the dining area that services customers seated at the bar and in the restaurant, and another bar near the lobby. Two bartenders typically staff each bar throughout business hours.

26. Plaintiff spent the majority of her shifts working the main bar.

27. Soon after Melody joined the team, she began sending Plaintiff home prior to the end of Plaintiff's shifts. If the bar or restaurant was not busy, Melody would regularly instruct Plaintiff to leave early so the other – younger – bartenders could make more money.

28. Melody consistently chose Plaintiff as the bartender who should leave, and never Plaintiff's younger counterparts.

29.　　　　Plaintiff complained to her managers about Melody's attempts to cut Plaintiff's shifts short. She explained that Melody was choosing her to leave because Melody did not think Plaintiff "fit in" with the younger employees.

30.　　　　Despite Plaintiff's complaint, Melody, empowered by Defendant Nocella, continued to order Plaintiff to leave shifts early. On one occasion, in or about June 2022, Plaintiff refused to leave before her scheduled shift ended.

31.　　　　Melody stormed out of the restaurant and stated that she would report Plaintiff to Defendant Nocella. Melody then promised that she would not stop harassing Plaintiff until Plaintiff was fired.

32.　　　　Soon after that incident, Defendant Nocella hired another young bartender, Mayah, a woman in her mid-20s with no bartending experience.

33.　　　　When Mayah started working, Defendant Nocella forced Plaintiff to give up one of her shifts so that Mayah had enough work.

34.　　　　Upon information and belief, Defendant Nocella was preparing to replace Plaintiff with this new young employee.

35.　　　　In or about July 2022, Plaintiff and Mayah worked together at the main bar. While Plaintiff was busy filling five different drink orders, Mayah asked Plaintiff to help her make one of the The Mark's signature cocktails, which included Benedictine.

36.　　　　Mayah could not find the bottle of Benedictine, even after Plaintiff pointed out where it was located. Plaintiff told Mayah to wait a couple of minutes so she could fill the five drink orders in front of her and then she would make Mayah's drink for her.

37.　　　　Plaintiff completed her orders and then made the drink for Mayah.

38.     Later that night, at the end of Plaintiff's shift, Defendant Holmes, one of the younger new managers on duty, called Plaintiff into the office and presented Plaintiff with a write-up for "failure to help a co-worker."

39.     Plaintiff was shocked by the blatantly false accusation and baseless write-up. Not only had Plaintiff assisted her younger and inexperienced colleague, but she had also done so while successfully filling five other drink orders.

40.     Plaintiff had complained weeks earlier about Melody's harassment, and about being treated differently than her younger counterparts, but Defendants did nothing in response. But, when Mayah, a very young employee, made a baseless complaint against Plaintiff, Defendants disciplined Plaintiff within hours.

41.     Defendants' employees continued to harass Plaintiff to the extent that in July 2022, Plaintiff had a cardiac episode and had to be rushed to the emergency room. Her caregivers determined that the incident was stress-induced and prescribed anti-anxiety medication.

42.     In or about November of 2022, The Mark restaurant's host brought a couple to the bar area where Plaintiff was working. The host instructed Plaintiff to give each of the customers a complimentary glass of wine because they had a longer than usual wait for their table.

43.     When Plaintiff asked the couple for their drink choices, the woman requested a glass of wine, but the man requested a shot of top-shelf single malt scotch that costs over $180 at The Mark's bar. Because Plaintiff had been instructed to provide wine, and because the whiskey pour was several times the cost of the wine, Plaintiff informed the customer apologetically that she was required to request permission from her manager before providing the more expensive drink.

44. As part of her training at The Mark, Plaintiff was instructed to never offer complimentary beverages without a manager's approval. Further, The Mark instructed her that any unapproved complimentary drinks would be considered "stolen" by the employee.

45. Once she had permission, Plaintiff promptly filled the drink order.

46. At the end of her shift that night, Defendant Holmes called Plaintiff to the office and again presented her with a write-up for "making a big deal" about the complimentary drink. Although the customer had not expressed any frustration to Plaintiff, Defendant Holmes alleged that the customer had complained that Plaintiff did not want to fill his drink order.

47. Again, Plaintiff protested the write-up but was forced to sign it anyway.

48. Upon information and belief, Defendant Holmes fabricated the complaint about Plaintiff as part of a campaign to rid the restaurant of its oldest bartender who did not "fit in" with the rest of the young attractive servers.

49. Plaintiff frequently witnessed customers complaining about her younger coworkers, and observed that they were not written up after these complaints.

50. For example, in March 2023 a younger female cocktail server received two customer complaints in one evening and was merely "spoken to" about it and not written up.

51. Even bartenders and servers named in scathing reviews online remain employed by Defendants.

52. While Plaintiff was getting written up, it was clear that her performance exceeded that of her younger colleagues.

53. The same month that Defendant Holmes baselessly issued Plaintiff a write-up, she successfully sold one of the restaurant's most expensive bottles of wine. After developing a positive rapport with one of her customers, he purchased a $12,520 bottle of wine. The customer

7

also gave her a $2,500 tip – though Plaintiff was required to share the tip equally with all of her colleagues serving that night.

54. In or about February 2023, Plaintiff received a $100 gift card as an award for excellent performance, including filling in for her coworkers, assisting colleagues, and providing the highest level of service.

55. Clearly, Plaintiff's performance was not the problem and not the reason she was so poorly treated by management.

56. On April 19, 2023, Easter Sunday, Plaintiff was working at the main bar. At approximately 4 p.m. Plaintiff's colleague, Zachary Quinones, arrived for his shift, and according to Defendants' policy, Plaintiff had to leave for her break.

57. Prior to leaving for her break, Plaintiff kindly asked Mr. Quinones to fill a drink order that had just come in so she could deliver the check to a group of her regular customers who she had been serving for the past several hours.

58. Mr. Quinones not only refused to help Plaintiff, he later said to her in sum and substance, "I don't care how you feel. You asked me to make your drinks, but this is what you are paid for – to make your drinks and do your job. So shut the fuck up and do your job. And by the way, go fuck yourself, bitch."

59. Mr. Quinones yelled this at Plaintiff at the bar, in front of a customer and in front of another employee.

60. Plaintiff immediately reported the incident to the managers on duty, and they said they would "speak to him" and then re-assigned Mr. Quinones to the lounge bar.

61.     Later that evening, Mr. Quinones approached Plaintiff and put his arm around her shoulders without warning. While holding her under his arm, Mr. Quinones asked Plaintiff if she was "okay."

62.     Plaintiff told Mr. Quinones not to touch her and pulled away from him. He again put his arm around her and said he "just wanted to make sure [she was] okay." Plaintiff again told him not to touch her.

63.     Soon after Mr. Quinones' unwanted embrace, Defendant Holmes approached Plaintiff at the bar and informed her that Mr. Quinones would like to apologize to her. Plaintiff told Defendant Holmes that she intended to report Mr. Quinones' sexual harassment and degrading behavior to human resources regardless of his apology.

64.     Defendant Holmes wasted no time retaliating against Plaintiff. At 9:30 p.m. that evening, Defendant Holmes called Plaintiff into the managers' office and presented Plaintiff with a bogus write-up for an incident that happened on April 1, 2023.

65.     Plaintiff immediately asked why she was suddenly receiving a write-up for an alleged infraction that occurred nine days earlier. Specifically, Plaintiff asked if the write-up was retaliation for her complaint of sexual harassment and her stated intention of escalating the matter to human resources.

66.     The managers denied any retaliatory motive, and falsely claimed that the write-up was delayed because they had not seen Plaintiff since the alleged infraction occurred on April 1, 2023. This was clearly false, as Defendant Holmes had worked with Plaintiff on all but one of her shifts during the preceding week.

67. On April 12, 2023, Plaintiff complained to human resources about Mr. Quinones' sexual harassment, the managers' retaliatory write-up, and the three previous false allegations made against her.

68. Human resources never responded to Plaintiff's emails.

69. Instead, on April 24, 2023, Defendants fired Plaintiff in retaliation for reporting sexual harassment and age discrimination. Defendant Holmes, who informed Plaintiff of her termination, said that she was terminated for performance reasons.

70. Upon information and belief, the same day that Plaintiff was terminated, Defendants interviewed and hired a younger male bartender to replace her.

## FIRST CLAIM FOR RELIEF
### Title VII of the Civil Rights Act of 1964,
### 42 U.S.C. §§ 2000e, *et seq.* – Gender/Age Discrimination Against The Mark

71. Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

72. In violation of Title VII, Defendants intentionally discriminated against Plaintiff on the basis of her gender and age, and subjected her to a gender-based hostile work environment.

73. As a direct and proximate result of Defendants, unlawful conduct, Plaintiff has suffered monetary and non-monetary damages, including but not limited to emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, and humiliation.

74. Defendants' conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily-protected rights.

75. As a result of Defendants' unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to damages for economic loss and emotional distress; punitive

damages; attorneys' fees and costs; and such other and further legal and equitable relief as this Court deems just and proper.

## SECOND CLAIM FOR RELIEF
### Title VII of the Civil Rights Act of 1964,
### 42 U.S.C. §§ 2000e, *et seq.* – Retaliation Against The Mark

76. Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

77. In violation of Title VII, Defendants retaliated against Plaintiff for opposing and complaining about gender discrimination/sex harassment.

78. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered monetary and non-monetary damages, including but not limited to emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, and humiliation.

79. Defendants' conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily-protected rights.

80. As a result of Defendants' unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to damages for economic loss and emotional distress; punitive damages; attorneys' fees and costs; and such other and further legal and equitable relief as this Court deems just and proper.

## THIRD CLAIM FOR RELIEF
### New York State Human Rights Law ("NYSHRL"),
### N.Y. Exec. Law §§ 290 *et seq.* – Age and Gender Discrimination Against All Defendants

81. Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

82. In violation of the NYSHRL, Defendants intentionally discriminated against Plaintiff on the basis of her age and gender.

83. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered monetary and non-monetary damages, including but not limited to emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, and humiliation.

84. Defendants' conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily-protected rights.

85. Defendants Nocella and Holmes are liable for aiding and abetting the conduct alleged herein.

86. As a result of Defendants' unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to damages for economic loss and emotional distress; punitive damages; attorneys' fees and costs; and such other and further legal and equitable relief as this Court deems just and proper.

**FOURTH CLAIM FOR RELIEF**
**New York State Human Rights Law ("NYSHRL"),**
**N.Y. Exec. Law §§ 290 *et seq.* – Retaliation Against All Defendants**

87. Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

88. In violation of the NYSHRL, Defendants retaliated against Plaintiff for opposing and complaining about gender and age discrimination.

89. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered monetary and non-monetary damages, including but not limited to emotional distress,

physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, and humiliation.

90. Defendants' conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily-protected rights.

91. Defendants Nocella and Holmes are liable for aiding and abetting the conduct alleged herein.

92. As a result of Defendants' unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to damages for economic loss and emotional distress; punitive damages; attorneys' fees and costs; and such other and further legal and equitable relief as this Court deems just and proper.

**FIFTH CLAIM FOR RELIEF**
**New York City Human Rights Law ("NYCHRL"),**
**N.Y.C. Admin. Code §§ 8-101 *et seq.* – Age and Gender Discrimination Against All Defendants**

93. Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

94. In violation of the NYCHRL, Defendants intentionally discriminated against Plaintiff on the basis of her age and gender.

95. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered monetary and non-monetary damages, including but not limited to emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, and humiliation.

96. Defendants' conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily-protected rights.

97. Defendants Nocella and Holmes are liable as employers and for aiding and abetting the conduct alleged herein.

98. As a result of Defendants' unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to damages for economic loss and emotional distress; punitive damages; attorneys' fees and costs; and such other and further legal and equitable relief as this Court deems just and proper.

99. The New York City Commission on Human Rights will be notified and sent a copy of this complaint.

### SIXTH CLAIM FOR RELIEF
### New York City Human Rights Law ("NYCHRL"),
### N.Y.C. Admin. Code §§ 8-101 *et seq.* – Retaliation Against All Defendants

100. Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

101. In violation of the NYCHR, Defendants retaliated against Plaintiff for opposing and complaining about gender and age discrimination.

102. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered monetary and non-monetary damages, including but not limited to emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, and humiliation.

103. Defendants' conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily-protected rights.

104. Defendants Nocella and Holmes are liable as employers and for aiding and abetting the conduct alleged herein.

105. As a result of Defendants' unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to damages for economic loss and emotional distress; punitive damages; attorneys' fees and costs; and such other and further legal and equitable relief as this Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A. An award of damages, according to proof, including compensatory damages and punitive damages, to be paid by Defendants;

B. Penalties available under applicable laws;

C. Costs of action incurred herein, including expert fees;

D. Attorneys' fees;

E. Pre-judgment and post-judgment interest, as provided by law; and

F. Such other and further legal and equitable relief as this Court deems necessary, just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all causes of action and claims with respect to which she has a right to jury trial.

Dated: November 28, 2025
New York, New York

Respectfully submitted,

*Michael Taubenfeld*
Michael Taubenfeld, Esq.
FISHER TAUBENFELD LLP
225 Broadway, Suite 1700
New York, New York 10007
Phone: (212) 571-0700
*ATTORNEYS FOR PLAINTIFF*

15